**BENDERSON–WAINBERG, L.P., Plaintiff,**

v.

**ATLANTIC TOYS, INC., et al., Defendants.**

**No. CIV.A. 01–5078.**

United States District Court, E.D. Pennsylvania.

Sept. 17, 2002.

Joanna M. Jacobs, Ralph A. Jacobs & Associates, Philadelphia, PA, for plaintiffs.

Howard A. Finkelman, Bock & Finkelman, Philadelphia, PA, for defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

## I. INTRODUCTION

In this breach of contract action, plaintiff, Benderson–Wainberg, L.P. ("Benderson"), the landlord of a commercial property located at Wrangleboro Consumer Square in Hamilton, New Jersey, seeks damages resulting from the failure of defendant Atlantic Toys, Inc. ("Atlantic Toys"), the tenant at the leased property, to make rental payments under a lease agreement, and from Atlantic Toys' subsequent abandonment of the leased property.

Defendants counterclaimed for alleged breaches of certain oral promises concerning the lease agreement. The court bifurcated for trial the issues of liability and damages.

After a bench trial, and pursuant to Federal Rule of Civil Procedure 52(c), the court entered partial judgment on the issue of liability only in favor of Benderson on Benderson's complaint and Atlantic Toys' counterclaim and against Atlantic Toys on Benderson's complaint and defendants' counterclaim. Thereafter, the court held a second bench trial solely on the issue of damages. What follows constitutes the court's findings of fact and conclusions of law as to damages. *See* Fed. R.Civ.P. 52(a).

Benderson contends that it is entitled to damages in the amount of $453,991.92, a figure which includes "past damages" in the amount of $216,876.58 and projected "future damages" in the amount of $220,280.54, plus $16,800 in attorney's fees.[1] As to past damages, Atlantic Toys contests the amount of liquidated damages, late fees, and charge for final inspection and repair that Benderson claims is owed. Atlantic Toys has also advanced its own future damage calculations, pointing out that the leased premises were relet by Benderson to a new tenant, who, had it stayed for the full term of five years, and exercised one of its two five-year options, would make Benderson $48,319.80 better off under the new lease than under the Atlantic Toys lease.[2]

---

1. Plaintiff's calculations, while not challenged by the defendant, are internally inconsistent in several respects. First, Benderson reports in its submissions to the court two different numbers representing past damages, $216,876.58 and $216,911.38. $216,876.58 appears to be correct, given the amounts on which it is based. Second, Benderson refers to two different numbers, $453,991.92 and $476,226.13, as representing its total damages. Of these, $453,991.92 is the amount ultimately sought as relief. Third, Benderson reports attorney's fees in two different amounts, $16,800 and $18,000, and provides no documentation that might suggest which of these is correct. It is unclear whether the $150 in "legal fees," listed in Exhibit A to Plaintiff's Proposed Findings of Fact and Conclusions of Law was a part of either calculation.

2. In fact, the defendant forecasts three possible values for the new tenant's lease by con-

Above and beyond the claimed amount of total damages, the parties clash over whether the lease agreement's plain language, which refers to "[a]ll costs charged to or incurred by [Benderson] in the collection of any amounts owed," Pl's Ex. A, ¶ 48 [hereinafter "Lease"], entitles Benderson to claim attorney's fees in the amount of $16,800.

For the reasons stated below, the court concludes that Atlantic Toys owes Benderson a total of $414,568.48 as follows. For the time after Atlantic Toys vacated the premises, and before the new tenant took possession, Atlantic Toys must pay Benderson $79,448.20 in unpaid rent, $77,844.40 in liquidated damages, $9,612.46 in unpaid common area maintenance fees, $559.35 for utilities and insurance, and $12,812.20 in unpaid taxes, and $21,632.67 in late fees that accrued on these items in accordance with the terms of the lease. Moreover, based on a comparative valuation of Atlantic Toys' lease and that of the replacement tenant, the court finds that Benderson is entitled to $220,280.54, an amount that represents the net loss of future rent reduced to present value.

Benderson is not entitled to collect $1,250 as a final inspection fee, because this fee was not set out under the terms of its lease. Moreover, although Benderson is entitled to collect from Atlantic Toys $77,844 in liquidated damages, Benderson may not collect late fees on top of and in addition to this amount, nor is Benderson entitled to $16,800 in attorney's fees. The court also finds that Atlantic Toys is entitled to a credit of $5,621.34, the amount of its security deposit, against all amounts owed to Benderson.

## II. BACKGROUND

On or about September 23, 1997, Benderson and Atlantic Toys entered into a ten year lease agreement ("lease") whereby Atlantic Toys agreed to lease store space located at Wrangleboro Consumer Square, a shopping center in Hamilton, New Jersey ("premises"). Benderson is the owner and operator of numerous shopping centers throughout the country. Atlantic Toys owns and operates several toy stores in the Philadelphia and South Jersey area. Defendants James R. Levy and Barry Shefsky are the principals of Atlantic Toys and guarantors under the lease. Levy holds a bachelor's degree in accounting from Villanova University.

Under the lease, which term commenced November 5, 1997 and which was to be governed by New Jersey law, Atlantic Toys agreed to make a security deposit, and to pay monthly rent, as well as to pay a pro rata share of local taxes, common area maintenance (CAM), common utilities and insurance. Any rent or other charge that remained unpaid more than ten days after it became due was subject to a flat late charge of two percent, accruing monthly on the balance of the unpaid bill. The lease also contained an acceleration clause, which provided that, should Atlantic Toys default on required payments and fail to cure the default after Benderson gave notice of it, the entire balance of the unpaid lease obligations for the full term of the lease would become immediately due and payable.

In the event that Atlantic Toys vacated the premises before the end of the lease term, the lease entitled Benderson to liquidated damages in an amount equal to the minimum monthly rent for every month that the premises remained vacant. These

sidering the economic effects on Benderson if the new tenant left after one term of its lease, or stayed for two or three terms. The

$48,319.80 represents the defendant's "probable case scenario."

liquidated damages were to be paid over and above all rent and other damages that Atlantic Toys already owed as a result of any breach of the lease. Moreover, Atlantic Toys agreed to pay "[a]ll costs charged to or incurred by [Benderson] in the collection of any amounts owed pursuant to [the] lease." Lease ¶ 48.

Beginning on or around December, 2000, Atlantic Toys failed to make the required payments under the lease as they became due. On or about January 5, 2001, Benderson notified Atlantic Toys that it was in default. Atlantic Toys failed to cure the default, and since December, 2000 has paid no rents or required charges. On or about March 11, 2001, Atlantic Toys vacated the premises.

The premises remained vacant for a year until a new commercial tenant, Dots, took possession on April 17, 2002. The Dots lease runs for five years, plus two five-year options to be exercised by Dots. Moreover, Dots has a right to terminate the lease after three years if sales at the premises fail to exceed $900,000 per year.

## II. DISCUSSION

### A. *Applicable Law*

■ The parties agree that under the lease the calculation of damages is to be made under New Jersey law. Under New Jersey law, a landlord seeking to recover damages for a tenant's breach of a lease must "establish the existence and continuance in effect of the contract of lease . . ., a breach of conditions, and the resultant damage flowing from such breach." *Clark v. Byrne,* 117 N.J.L. 301, 187 A. 165, 167 (1936). Damages must be proved by a preponderance of the evidence, *Caputo v. United States,* 157 F.Supp. 568, 569 (D.N.J.1957). The calculation of damages must be reasonably certain. *See Lane v. Oil Delivery, Inc.,* 216 N.J.Super. 413, 524 A.2d 405, 409 (1987) (noting that plaintiff must prove damages "with such certainty

as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate"). The court will evaluate Benderson's claim to past damages, future damages, and attorney's fees, separately and seriatim.

### B. *Past Damages*

According to Benderson, "past damages" are those damages incurred during the time when the premises were unoccupied after Atlantic Toys had vacated in violation of the lease, and before Dots took possession. The claims to past damages include $77,448.20 in unpaid rent, $77,844.40 in liquidated damages, $9,612.46 in common area maintenance costs, $559.35 in utilities and insurance fees, $12,812.20 in taxes, $35,344.77 in late fees, $5.20 in credit reports, and $1,250 for final inspection and repairs. Defendant Atlantic Toys contests only the amount of liquidated damages, the late fees, and the charge for final inspection and repair.

#### 1. *Atlantic Toys' liquidated damages challenge*

■ Under New Jersey law, a party challenging the enforceability of a liquidated damages clause under a commercial lease bears the burden of proving its unreasonableness, *see Wasserman's, Inc. v. Township of Middletown,* 137 N.J. 238, 645 A.2d 100, 108 (1994); *see also Metlife Capital Fin. Corp. v. Washington Ave. Assocs. L.P.,* 159 N.J. 484, 732 A.2d 493, 499 (1999) (characterizing liquidated damages provisions "presumptively reasonable" in a "commercial context between sophisticated parties," and placing the burden of proving unreasonableness on a provision's challenger).

■ The decision as to enforceability is ultimately a question of law for the court. *Wasserman's,* 645 A.2d at 110. In

doing so, the court must consider "whether the set amount 'is a reasonable forecast of just compensation for the harm that is caused by the breach' and whether that harm 'is incapable or very difficult of accurate estimate.'" *Id.* at 106–07 (quoting *Westmount Country Club v. Kameny,* 82 N.J.Super. 200, 197 A.2d 379, 382 (1964)). In practical effect, "the more uncertain the damages caused by a breach, the more latitude courts [give] the parties on their estimate of damages." *Metlife,* 732 A.2d at 498. If these elements of reasonableness are absent, a liquidated damages clause is void as a penalty. *See Westmount Country Club,* 197 A.2d at 382. ("Penalty is the sum . . . which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.").

■ In the present case, Benderson claims $77,844.40 in liquidated damages, calculated in accordance with the terms of the lease, as "an amount equal to the minimum monthly rent, which damages shall be paid in addition to and not in lieu of all other damages to which Lessor is entitled by law or by this Lease." Lease, ¶ 53B.[3] Defendant Atlantic Toys asserts that this provision is void as a penalty, because it doubles the amount that Atlantic Toys is already obligated to pay as rent for the building as it stands empty. The court concludes that Atlantic Toys has failed to meet its burden of overcoming the presumption of reasonableness that attaches to liquidated damages provisions in the commercial context. *See Metlife,* 732 A.2d at 499.

First, the court finds that the damages that would flow from Atlantic Toys' breach of the lease were difficult to estimate with certainty at the time that the parties signed the lease. To this effect, Benderson presented the testimony of Stewart Wainberg, a partner of Benderson Development Company, the largest private owner and operator of shopping centers in the United States. T.T. at 1. Mr. Wainberg testified to a "ripple effect" that occurs in the stores adjacent to the vacant space when space is "dark," i.e., without a tenant for a period of time. As a result of unappealing and empty spaces, less traffic comes to the shopping center in general, and specifically to the parts of the shopping center where there is vacant space. T.T. at 17. As a result, the decreased traffic either reduces the actual percentage rent that the landlord receives, or the ability of the landlord to collect percentage rent at all from those tenants that remain in the shopping center. *Id.* at 27–28. Moreover, of the remaining tenants, some have lease provisions that allow them to pay only percentage or half rent, or even terminate their leases, if vacancies in the building exceed a certain number. *Id.* at 17–18. Mr. Wainberg pointed out that estimating the total amount of damages is extremely difficult, if not impossible. *Id.* at 28. Atlantic Toys did not contradict this testimony, or offer any testimony to the contrary.

Second, applying the principle that the more uncertain the damages, the greater latitude the parties should have in their estimate of damages, *Metlife,* 732 A.2d at 498, the court finds that setting liquidated damages in the amount of one month's rent for every month that the premises remain vacant is a reasonable means of addressing the difficult to determine damages that Benderson would incur as a result of Atlantic Toys' breach. Instructive

---

**3.** According to the terms of the lease, the monthly rental during the period when Atlantic Toys vacated was $5,972.67. Lease, at 1. The premises stood vacant for approximately 13 months. Atlantic Toys does not contest the accuracy of Benderson's calculation of liquidated damages according to the terms of the lease.

**590**

is *Landover Mall Ltd. P'ship. v. Kinney Shoe Corp.*, 944 F.Supp. 443 (D.Md.1996). In that case, which is markedly similar to this one, the court found that doubling minimum rent was a reasonable approximation of damages when at the time that the parties executed the lease it was known that a violation of the lease would "affect the Mall's vacancy rate, tenant mix, customer draw, profitability, or . . . ability to relet the space," *id.* at 445, but that "it was unknown by either party just what the actual and consequential damages would be." *Id.* at 446.[4]

Applying the same logic in the present case, the court concludes that, in this context, one month's minimum rent for each month that the premises are vacant is a reasonable forecast of just compensation for the harm that would be caused by Atlantic Toys' breach, given that the harm is incapable or difficult of accurate estimate. *See Wasserman*, 645 A.2d at 106–07. Accordingly, Benderson is entitled to $77,844.40 in liquidated damages for the year that the premises remained vacant.

### 2. *Late fees*

 A charge of late fees may be considered a "valid measure of liquidated damages," *Metlife*, 732 A.2d at 499. A presumption of reasonableness attaches to a provision in a written lease requiring the payment of late fees in the event of default. *See id.* The burden of proving unreasonableness falls squarely on the challenger. *Id.* In this case, Atlantic Toys' bare assertions that the late fee arrangements set forth in its lease with Benderson are usurious, unreasonable and unsubstantiated, are insufficient to satisfy

its burden of proving that late fees charged were not reasonable. Thus, the court finds that Benderson is entitled to late fees at the rate specified in the lease for past due rent, CAM, taxes, utilities, and insurance.

This court finds, however, that Benderson is not entitled to collect late fees for the period during which it is also entitled to recover liquidated damages. The Lease between Benderson and Atlantic Toys states that "[a]ny rents remaining unpaid ten (10) days after due date or any other charges remaining unpaid (10) days after receipt of invoice shall be subject to a two percent (2%) monthly late charge." Lease, at 1–2. In practical effect, the language of this provision enables Benderson to collect for each month that the premises remained vacant a flat payment of two percent of the total delinquent bill. Accordingly, Benderson has claimed a total of $35,344.77 in late fees on rent and other charges, which accumulated on CAM, liquidated damages, utilities, and insurance for the time during which the premises stood vacant. Atlantic Toys asserts that the 2% monthly late charge is usurious and unreasonable, because, should a bill remain unpaid over the course of a year, the delinquent tenant would end up paying the equivalent of 24% interest.

New Jersey courts have not settled on a bright line percentage above which a late fee will be deemed a penalty as a matter of law. However, the New Jersey Supreme Court's opinion in *Metlife*, 732 A.2d at 493, which addressed the imposition of a flat percentage late fee associated with late payments on a mortgage, is instructive as

---

4. In reaching its final determination of reasonableness, the court also analyzed the facts and circumstances surrounding the Lease at the time that it was made, and concluded that the tenant in that case was aware that damages were uncertain, had several opportunities to negotiate changes to the clause, and

was familiar with the 100% minimum rent requirement. *See Landover Mall*, 944 F.Supp. at 446–47. Similarly, in this case, Atlantic Toys has presented no evidence that it was blindsided by the liquidated damages provision, and had no ability to negotiate changes to it.

a point of comparison.[5] In *Metlife*, the court considered late fees on a promissory note, and deemed the note's flat percentage late fee of five percent per month to be a "valid measure of liquidated damages." *Id.* at 502.

 The court's reasoning in *Metlife* singled out two key considerations bearing on reasonableness: (1) the direct link between amount of damages and amount owed, *id.* at 500, and (2) the sophistication of the parties. *Id.* at 502. As to the first, in spite of the fact that the late fee was calculated according to a flat percentage rate, it nonetheless reasonably reflected and approximated the lender's damages. In particular, the court noted that "damages resulting from the loss of investment opportunity increase with the size of the late installment payment. Thus, a lender suffers both larger administrative and 'opportunity cost' damages when a borrower is late with a larger payment." *Id.* at 500. The same logic obviously applies to late payments due under a lease. As one court explained in the context of a landlord-tenant situation:

> [T]he late fee is intended to compensate Landlord for the administrative expense and inconvenience associated with untimely rent, including late payment notices and additional bookkeeping, and for the loss of rental income. Landlords ... typically have mortgage payments, real estate taxes, insurance, maintenance and other expenses required to maintain the leased property. Delinquent rent not only results in a loss of use, measured as interest, but also interrupts normal cash flow and may affect the landlord's ability to meet its operating expenses ... The greater the amount of late rent and the longer the rent remains past due, the greater the adverse impact on the landlord's business.

*Gershin v. Demming,* 685 N.E.2d 1125, 1130 (Ind.Ct.App.1997).

 In this similar context, the court concludes that damages from the late payment of the lease obligation are in this case inherently difficult to estimate, and potentially quite significant, depending on the amount past due. Considering that New Jersey has allowed a five percent flat fee accruing monthly in the commercial lending context, *Metlife*, 732 A.2d at 499,[6] Benderson's two percent fee accruing monthly does not appear so unreasonable or disproportionate as to constitute a penalty. Atlantic Toys has offered no evidence to the contrary.

The second consideration that the *Metlife* court explored was the apparent sophistication of the commercial parties. *See id.* at 502. This factor weighs heavily against Atlantic Toys in the present case. Atlantic Toys is in the business of operating retail stores at shopping centers, and thus has previously entered into similar lease agreements. Atlantic Toys also was

---

5. The *Metlife* court specifically stated: "This holding applies only to commercial loan transactions and does not address the issue of enforceability of liquidated damage clauses in consumer contracts or in residential mortgages." *Metlife*, 732 A.2d at 502 n. 2. Given the overall tenor of the *Metlife* opinion, which contains repeated references to the sophistication of the parties involved in the transaction at issue, it appears that the court had specific concerns about the implications of its opinion with respect to inexperienced private parties. These concerns are not implicated in the present case, as Benderson identifies itself as the largest developer of shopping centers in the United States, Atlantic Toys is a major corporate concern, and the lease at issue is wholly commercial.

6. At least one court outside New Jersey has endorsed a one percent flat percentage daily late fee, which, under the same logic advanced by Atlantic Toys, could amount to a 365% interest payment if allowed to accrue over a year, *Gershin*, 685 N.E.2d at 1130.

represented by counsel in negotiating the lease. Moreover, one of its principals holds a B.A. in accounting. In *Metlife*, as here, the transaction "involved an arms-length, fully negotiated transaction between two sophisticated commercial parties, each represented by counsel," *Metlife*, 732 A.2d at 502. In the final analysis, the *Metlife* court noted that "a small percentage late charge on a commercial loan is simply part of the cost of doing business." *Id.*

As a commercial party challenging late fees, Atlantic Toys bears a heavy burden of overcoming the presumption of reasonableness. *Wasserman's Inc. v. Township of Middletown*, 137 N.J. 238, 645 A.2d 100, 108 (1994); *see also Metlife*, 732 A.2d at 499. This it has failed to do. Accordingly, Atlantic Toys must be held to the bargain that it made with respect to late fees that accrued on unpaid rent, CAM, taxes, utilities, and insurance.[7]

■■■ Benderson also apparently contends that under the lease, it is entitled to collect late fees on the amount of liquidated damages.[8] The lease provides that "for each month such violations occur, [Lessee] shall pay Lessor as liquidated damages an amount equal to monthly rent." Lease, ¶ 53B. The court disagrees. The fact that under the lease liquidated damages are *measured* in terms of minimum monthly rent does not mean that such payments constitute rent, nor does any provision in the lease mention when such payments are due, or set forth what additional penalties, if any, might attach. Because liquidated damages are not rent, they are not subject to the late fees that may attach to rental payments.

Moreover, to the extent that the liquidated damages provision in the lease purports to be a reasonable estimate of the landlord's damages for a tenant's breach, allowing the collection of late fee payments on top of liquidated damages would constitute partial double recovery.

Therefore, Benderson is entitled to a total of $21,632.67 in late fees accruing only on unpaid rent, CAM, taxes, utilities, and insurance only,[9] and not on the amount of liquidated damages.

### 3. *Final inspection fee*

Defendant Atlantic Toys challenges Benderson's claim of a "final inspection fee and repair" of $1,250 as "overreaching" on the part of the landlord. This dispute is easily resolved by reference to the lease. The agreement, which is otherwise replete with details on charges owed, makes no mention of any final inspection fee. Accordingly, such a fee is not one of the charges arising under the terms of the

---

7. Benderson also seems to have included in its total calculation of claimed late fees $350 and $18 in late fees for Atlantic Toys' nonpayment of a $1,250 inspection fee and $150 in "legal fees," respectively. Because the court concludes that Benderson is entitled to neither the inspection fee, *see infra* Part II.B.3, nor attorney's fees, *see infra* Part II.D, Benderson may not collect the late fees associated with these expenses. Accordingly, the court has subtracted an additional $368 from the total amount of late fees that Benderson claims.

8. The liquidated damages provision states that such "damages shall be *in addition to and not in lieu of* all other damages to which the Lessor is entitled by law or by this lease." Lease, ¶ 53B. (emphasis supplied). The late fee provision states that "any ... charges [other than rent] remaining unpaid ten (10) days after receipt of invoice shall be subject to a two percent (2%) monthly late charge." Lease, at 1. To the extent that liquidated damages fall under the rubric of "other charges," they are arguably subject to the two percent late fee.

9. As noted above, Benderson is not entitled to collect late fees on any amount of attorney's fees, or on the final inspection fee. *See* discussion, *supra* note 7.

lease, and Benderson is not entitled to collect it.

### 4. *Security deposit*

Atlantic Toys asserts that its security deposit of $5,621.34, entrusted to Benderson at the beginning of its lease, should be credited toward any amount that it is found to owe in the course of these proceedings. The lease indeed provides that, in the event of breach of lease, "Lessor may apply all or part of the Security Deposit to ... default." Lease, ¶ 48. It makes no mention of any right on the part of the landlord to keep the entire security deposit if damages are otherwise paid. Therefore, Atlantic Toys should be credited with having already paid Benderson $5,621.34 toward satisfying its obligation.[10]

### 5. *Summary of past damages*

The court finds that Atlantic Toys owes Benderson a total of $199,909.28 in past damages for unpaid rent, CAM, taxes, utilities, and insurance, and liquidated damages. Of this figure, Benderson may collect only $21,632.67 in late fees for unpaid rent, CAM, taxes, utilities, and insurance; Benderson is entitled to no late fees on top of the liquidated damages. Because the lease makes no provision for payment of a final inspection fee, Benderson is not entitled to the $1,250 that it claims as such a fee, or any late fee that accrued on this amount when Atlantic Toys did not pay. Similarly, because the court disallows attorney's fees in this case, *see infra* Part II.D., Benderson is entitled to no late fees as to this item. Lastly, Atlantic Toys is entitled to a credit in the amount of $5,621.34, its security deposit, toward any total amounts owed.

### C. *Future Damages*

A present value calculation is integral to any realistic estimation of future losses.

*See Chesapeake & Ohio Railway Co. v. Kelly,* 241 U.S. 485, 489, 36 S.Ct. 630, 60 L.Ed. 1117 (1916) (noting that "[s]o far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded," because "a given amount of money in hand is worth more than the like sum of money payable in the future."); *see also Russell v. City of Wildwood,* 428 F.2d 1176, 1181 (3d Cir.1970) (applying New Jersey law) ("The objective is to place the plaintiff in the same economic position as would have been his if the injury had not occurred."). Present value represents "what interest could be fairly expected from safe investment which a person of ordinary prudence, but without particular financial experience and skill, could make...." *Russell,* 428 F.2d at 1183. A party may establish present value through the use of expert witnesses, or through introducing the standard tables into evidence. *See Chesapeake & Ohio R.R. Co.,* 241 U.S. at 491, 36 S.Ct. 630.

At trial, Benderson offered the testimony of Stewart Weinberg as an expert. Mr. Weinberg has twenty-five years of experience in shopping center commercial leasing. Mr. Weinberg testified that the lease with the replacement tenant was for five years with a "kick out" provision available to the tenant at the end of three years. Mr. Weinberg testified that, based on his experience, there was a 75% probability that the new tenant would terminate the lease at the end of three years. Based on this assumption, Weinberg first calculated the net rent that Benderson would receive during the first three years of the new lease, factoring in the amount that Benderson spent in construction costs to prepare the premises for the new tenant. Second, Weinberg calculated the net rent

10. *See infra* Part III.

that it would receive during the last two years of the five year lease, once it had recouped its construction costs. Third, Weinberg discounted the last two years' rent by 75% to reflect the probability that the lease would not be extended beyond three years. From these calculations, Weinberg found the value of the replacement lease to be $127,238.88. He then subtracted that amount from $415,405.04, which represented the rental value of the Atlantic Toys' lease. Weinberg then discounted the difference ($415,405.04 - $127,238.88 = $288,166.16) by a rate of 4.75% monthly for a total of $220,280.54.

Defendant does not quarrel with the method that Mr. Weinberg used to calculate the present value, as such.[11] Rather, defendant proposed an alternative method for calculating future damages. In this vein, through the testimony of Mr. Levy, one of Atlantic Toys' principals and an accountant by training, it reduced the amounts that it owed on the balance of its ten year lease to present value, $351,917.30, and estimated that it owed $67,789.36 for the twelve months when the premises stood vacant.[12] It then made three different present value calculations of the value of the Dots lease, based on whether Dots would decide to remain Benderson's tenant for five years, or exercise its two five-year options to renew, and therefore remain on for ten or fifteen years.[13] Atlantic Toys then subtracted the

[11]. A survey of the case law reveals that Benderson's method of calculating its future losses deviates somewhat from what appears to be the rule. See *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 688 (5th Cir.1989) ("The plaintiff must prove the present value of future rents less the present value of actual rents received or the cash market value of the property for the remainder of the lease."); *In re J. Bildner & Sons, Inc.*, 106 B.R. 8, 13 (Bankr.D.Mass.1989) ("[T]he federal rule ... provides that the measure of damages is the difference between the present lease value for the remainder of the term and the present fair rental value of the remainder of the term both discounted to present value."); *Third Nat'l Bank v. Winner Corp.*, 29 B.R. 383, 385 (M.D.Tenn.1982) (citing *Miller v. Irving Trust Co.*, 296 U.S. 256, 258, 56 S.Ct. 189, 80 L.Ed. 211 (1935) and *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 450, 57 S.Ct. 298, 81 L.Ed. 340 (1937)) ("[O]ne must subtract the present rental value for the remainder of the term of the lease discounted to present value from the value of the rent reserved in the lease, also discounted to present value. [This] ... step anticipates mitigation of damages by the landlord."). Because Atlantic Toys did not object to Benderson's method of calculating present value, any objection is waived.

Moreover, Atlantic Toys' own expert appeared to agree with Benderson's method. See T.T. at 49–50.

Q: When you relet the property ... that the tenant has vacated, how did you apply those rental sums of money to what was owed to the tenant who vacated?

A: We would credit ... the lessee.

Q: Would you credit it toward the amount that was due in the remaining years of the lease, or did you credit it to the amount due for the remaining years of the lease computed at present value? Did you apply that present value before or after you applied-

A: To the net number.

Q: To the net number before you present-valued it?

A: Yes.

[12]. In fact, this number does not reflect the full amount of damages that Benderson suffered during the period of vacancy. Atlantic Toys, unlike Benderson, did not add to this amount, for example, what it owed in pro rated rent for 17 days in April before Dots took possession.

[13]. At trial, the defendant argued that Dots' two five year options to renew its lease had value to Benderson, because, if Dots exercised them, Benderson would be in a better economic position than it would have been had Atlantic Toys occupied the premises for the duration of its lease. However, as the court noted at trial, when the landlord extends options to its tenants, it loses the flexibility to rent the space to another tenant at a potentially higher price. Accordingly, this court concluded that options to renew had no value to Benderson. T.T. at 69–71.

present value of the Dots lease in each of the three scenarios from the present value of the Atlantic Toys lease, $351,917.30. To this difference, Atlantic Toys then added the total amount due for downtime when the premises stood vacant. Of these three scenarios, Atlantic Toys asserted, without stating the basis for this assumption, that Dots would remain for all five years in the original lease and would then exercise one five year option. Based on this assumption, Atlantic Toys argues that Benderson would be better off by $48,319.80 under the Dots lease.

This calculation is flawed in two respects. First, Atlantic Toys' valuation does not take into account unpaid taxes, utilities or insurance payments that would fall due during that time, T.T. at 58–59, or the fact that the premises was vacant for more than twelve months. Second, Atlantic Toys' model does not take into account the likelihood that Dots would terminate its lease three years into its five year term. Third, Atlantic Toys contends that the two five-year options held by Dots are of value to Benderson. This is not so. An option to extend or renew the term of a lease is valuable to the party who holds it—Dots, not to the party who grants it—Benderson. Indeed, in his testimony at trial, Stewart Wainberg testified for Benderson that Dots negotiated for a kick out provision that would almost certainly result in Dots' terminating the lease after three years.[14]

Based on the foregoing, the court concludes that Benderson has proved its damages by a preponderance of the evidence and with reasonable certainty. Accordingly, is entitled to $220,280.54, the present value of its future damages.

### D. Attorney's fees

The phrase "collection costs" may encompass attorney's fees. *See, e.g., FDIC v. Wiley*, Civ. No. 91–2726, 1993 WL 21085, at *1 (D.N.J. Jan. 19, 1993) ("[T]he note contained a collection-costs clause stating, '[i]f you sue me to collect this Note, I will pay you all court costs permitted by law, plus an attorney's fee....'"). Indeed, as a general rule, "[t]he contract language 'all reasonable collection costs' is a broad term, and a common sense reading includes attorney's fees." *Okla. Fixture Co. v. ASK Computer Sys., Inc.*, 45 F.3d 380, 382 (10th Cir.1995).

In practice, courts construe the language of collection costs clauses in light of the overall structure of the document. *See id.* ("[H]ere, the situation that gives rise to the right to recover 'reasonable collection costs' is where it is necessary ... to initiate legal proceedings. Taken together with the reasonable collection costs language, the 'legal proceedings' language can only mean that attorney's fees are to be included under this provision."); *RB–3 Assocs. v. M.A. Bruder & Sons, Inc.*, No. C–3–95–198, 1996 WL 1609231, at *3 n. 2 (S.D.Ohio. Aug. 26, 1996) ("[A]lthough ...

**14.** At trial, Mr. Weinberg testified as follows: Dots originally insisted on doing a three-year deal. We really hadn't done three year deals in that entire property, so we resisted ... but the space was vacant ... so the compromise ... was to give them a five year deal with the right to terminate if their sales did not exceed $900,000. In their mind $900,000 was a high number, which more or less preserved their right to terminate.

We have about eight other Dots deals right now ... [and] those stores by and large are mature, and of those eight stores six of them are doing considerably less than $900,000.... So using our track record with them, there is a 75 percent probability that they would have the ability to terminate.
T.T. at 9–10.

the Lease Agreement provides that all collection costs will be paid by the Lessee, the term 'collection costs' apparently does not refer to attorneys' fees, as the Lease contains a specific provision for attorneys' fees in [another section].").

In the present case, Benderson claims $16,800 in attorney's fees on the basis of the following language in the lease, which appears under a caption labeled "collection costs": "All costs charged to or incurred by Lessor in the collection of any amounts owed pursuant to this Lease shall be paid by Lessee...." Lease, ¶ 49. Atlantic Toys retorts that the lease language does not obligate it to pay Benderson's attorney's fees, pointing out that there is no specific clause that provides for payment of attorney's fees, or any language that suggests a link between collection costs and attorney's fees. Given that the language in the lease is subject to varying interpretations, including the one suggested by Atlantic Toys, the court concludes that the document is ambiguous.

As a rule of construction for collection clauses, "ambiguity ... must be construed against ... the drafter of the document." *Bank of New Jersey v. Larson*, 23 B.R. 466, 473 (Bankr.D.N.J.1982) (noting that "[a]lthough the [drafter] might have meant to make all collection costs recoverable, such intent is not clearly stated in the promissory notes"). Thus, the court construes the ambiguity in this lease against Benderson. Given that one reasonable interpretation of the lease suggests that the term "collection costs" did not include payment of attorney's fees, the court will deny attorney's fees in this case.[15]

## III. CONCLUSION

Based on the foregoing analysis, judgment is entered in favor of Benderson in the amount of $414,568.48. This figure is comprised of $199,909.28 in past damages and $220.280.54 in future damages, minus a credit in the amount of $5,621.34, which represents Atlantic Toys' security deposit. Attorney's fees are denied.

An appropriate order follows.

### *JUDGMENT*

**AND NOW,** on this ____ day of September, 2002, after a bench trial, pursuant to Federal Rule of Civil Procedure 52(a) and the court's order of June 17, 2002 entering partial judgment in favor of plaintiff on plaintiff's complaint and defendants' counterclaim and against defendant on plaintiff's complaint and defendants' counterclaim on the issue of liability only, **JUDGMENT** is **ENTERED** in favor of plaintiff and against defendants in the amount of $414,568.48.

**AND IT IS SO ORDERED.**

---

**15.** In any event, Benderson's claim of attorney's fees fails for want of proof. If a party asks at trial for attorney's fees pursuant to a collection costs clause, the record must be "sufficiently complete to enable [the court] to reach a fair determination as to the extent of the legal services rendered and the reasonable value to be paid pursuant to the contractual provision." *Cohen v. Fair Lawn Dairies, Inc.*, 44 N.J. 450, 210 A.2d 73, 74 (1965). Here, Benderson has provided no evidence to substantiate its claim of attorney's fees in the amount of $16,800.